Michael **BORMASTER**, Appellant,

v.

George **BALDRIDGE**, Respondent.

No. 14765.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 13, 1987.

Motion for Rehearing or to Transfer
to Supreme Court Denied
Feb. 3, 1987.

Kenneth J. Rothman & Fred Roth, Clayton, for appellant.

Greg B. Carter, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, for respondent.

CROW, Chief Judge.

Michael Bormaster ("appellant") sued George Baldridge ("respondent"), an attorney-at-law, for alleged malpractice. Respondent moved for summary judgment, Rule 74.04, Missouri Rules of Civil Procedure (17th ed. 1986), on the ground that the action was barred by the 5–year statute of limitations, § 516.120, RSMo 1978. The trial court granted the motion. This appeal followed.

The pleadings, depositions, exhibits and answers to requests for admissions establish that respondent, at the direction of Ben Bormaster, prepared an instrument dated

January 2, 1969, captioned "Trust Agreement of Ben Bormaster." At that time, Ben Bormaster had two children, a daughter, Carol, born in 1939, and appellant, born in 1944. Carol was the wife of Alan Kaufman, and they were parents of two minor children: Lynda Beth Kaufman and Deborah Ann Kaufman.

The trust agreement provided, among other things, that after Ben Bormaster's death the trust property would be divided into separate trusts, equal in value, one for each living child of Ben Bormaster and one for the living descendants, collectively, of each deceased child of Ben Bormaster. The agreement further provided that Ben Bormaster, during his lifetime, could amend it from time to time "by a written instrument, signed, acknowledged and delivered to the co-trustees." Ben Bormaster and appellant were named in the agreement as co-trustees.

The signature of Ben Bormaster appears twice at the foot of the agreement, once as grantor and once as trustee. Appellant's signature appears at the foot of the agreement as trustee. Following the signatures is an acknowledgement clause, duly notarized, stating that Ben Bormaster signed the agreement February 28, 1969.

On June 28, 1969, Carol Kaufman died. Respondent, at the direction of Ben Bormaster, thereafter prepared an instrument dated July 19, 1969, captioned "First Amendment to Trust Agreement of Ben Bormaster." It provided, among other things, that after Ben Bormaster's death the entire trust property would be distributed to appellant if he survived Ben Bormaster. If appellant failed to survive, the trust property would be divided into separate trusts, equal in value, one each for Lynda Beth Kaufman and Deborah Ann Kaufman. At the foot of the instrument were signature lines for Ben Bormaster as grantor, Ben Bormaster as trustee, and appellant as trustee. Following the signature lines was an acknowledgement clause, to be completed by a notary public, evidencing that Ben Bormaster had signed the instrument as his free and voluntary act.

Respondent met Ben Bormaster around noon that date at a Joplin restaurant, where Bormaster, in respondent's presence, signed the amendment. At that time, appellant was employed at a bank in Chicago. Respondent, in his deposition, testified that as best he could recall, Bormaster took the amendment with him "to get [appellant] to sign it." Respondent added that he told Bormaster "to get it acknowledged." Then, this:

"Q. Was there any reason why you couldn't have had it notarized that day?

A. Yes. It was on Saturday afternoon, or Saturday at noon, and the notaries don't work on Saturday afternoon in Joplin, or anyone I knew. It was really brought up as a draft—it was just prepared, just got finished, was brought then. He was going to get it signed and acknowledged.... I didn't know he was going to approve it when I took it up there."

Ben Bormaster died testate November 8, 1969. His will—executed after Carol Kaufman's death—was probated in the Probate Court of St. Louis County.[1] Appellant served as executor; respondent served as attorney for the executor.

The will, after making certain cash bequests including $7,500 each to Lynda Beth Kaufman and Deborah Ann Kaufman, directed that all of Ben Bormaster's "residuary estate" be added to the property of the trust created by the January 2, 1969, trust agreement.

During administration of the estate, appellant's two nieces, Lynda and Deborah, were paid their cash bequests. Upon final settlement (some two years after Ben Bormaster's death), appellant, as executor, dis-

---

1. Ben Bormaster had come to Joplin as a child, had grown up there, and had gone into business there with a brother. In the mid-1950's, he moved with his family to St. Louis County, but retained business interests in Joplin. Respondent, who once had an office in a building owned by Ben Bormaster and his brother, began doing legal work for Ben Bormaster in the mid-1960's.

tributed the residuary estate to himself as trustee under the aforementioned trust agreement. Thereafter, appellant distributed nothing from the trust to either of his nieces.

Three years or so elapsed without incident, then, in early 1975, one Marilyn Lipman went to the Probate Court and examined the file in the closed estate of Ben Bormaster. Appellant explained that Mrs. Lipman is his first cousin—a daughter of his mother's sister. Asked what motivated Mrs. Lipman to investigate, appellant responded, "Well, I think that she thought that the two grandchildren should have got more money out of—you know, out of my father's trust and his estate; and so she went down to see if there was any loopholes she could find."

Appellant learned that Mrs. Lipman had been "digging" in the probate file when she phoned and asked him to come to her home. Appellant went there, and was confronted by Mrs. Lipman and her brother, Murray Vittert. Appellant quoted Mrs. Lipman as saying, "I understand that you received more money or assets from your father's estate and trust than Lynda and Debbie Kaufman." Appellant, according to his deposition, conceded to Mrs. Lipman that she was correct, but explained to her that his father "wanted me to have most of his wealth."

Appellant quoted Mrs. Lipman as saying that his two nieces, Lynda and Deborah Kaufman, should have received half and that he should have received half. Additionally, recalled appellant, Mrs. Lipman said she had found some "trust papers," and that "they were not signed or acknowledged."

This incident, according to appellant, prompted him to phone respondent. Appellant recalled saying, "George, one of my cousins here in town says that this trust, or amended trust, was never signed or being acknowledged, the one that was filed in the probate court." Appellant further recalled asking respondent: "[W]hy was this? Why wasn't it signed or notarized?"

Appellant's deposition proceeded:

"Q. Were you concerned about the effects of [the amendment] not being signed at that time?

A. Well, I didn't really—yeah, I was concerned. Yes, I was concerned.

Q. Why were you concerned?

A. Well, that would have made the amended trust invalid and would have reverted back to the original trust.

Q. And you knew that when you called [respondent] and said to him you try and find one that is signed and I'll stay here in St. Louis and look for one that is signed?

A. Signed and notarized.

Q. This is the day or two days after you talked with Mrs. Lipman?

A. Yes."

A couple of weeks later, according to appellant, Alan Kaufman confronted him and "wanted to know if I was going to give them any money." Appellant recalled telling Kaufman: "Well, I don't know. Let me think about this."

By this time—as we understand appellant's deposition—the amendment of July 19, 1969, which Ben Bormaster had signed that date in respondent's presence at the Joplin restaurant, had been located. Where it was found is unclear from the record, but it did bear appellant's signature, in addition to Ben Bormaster's. The acknowledgement clause, however, had never been completed by a notary public. Although the probate file is not before us, it is evident that an *unsigned* (and unacknowledged) copy of the amendment had been filed in the Probate Court sometime during administration of Ben Bormaster's estate.

Regarding the attitude of Alan Kaufman after Mrs. Lipman's discovery, appellant's deposition shows this:

"Q. Was there any suggestion by the Kaufmans at that time that you had unduly influenced your father in trying to get this amendment to the trust taken care of?

A. I don't remember anything.

Q. The sole conversation at that time, that you recall, went to the question of whether the amendment had been acknowledged?

A. Yes.

Q. That was the only item that they were talking about as a basis for getting the trust set aside?

A. Yes."

Appellant subsequently decided to reject Alan Kaufman's demand. Appellant's deposition:

"Q. When that decision was made, did you consult with [respondent] about what you ought to do?

A. Yes, we talked about it. And it was my own decision whether or not to give them money, you know, give any money or not. We talked about, I guess, what might happen; and I just decided not to give it to him.

Q. When you say you talked with [respondent] about what might happen, what did [respondent] tell you might happen?

A. Well, get sued.

Q. You could get sued?

A. Yeah.

Q. Did he also explain to you that if the Kaufmans were correct, that the amendment wouldn't be any good and that we would revert to the original trust agreement?

A. Must have, whether he said it or it was just kind of an understood thing."

On May 13, 1975, Eugene J. Gabianelli, an attorney-at-law, sent a letter to appellant stating, in pertinent part:

"This firm represents Lynda Beth Kaufman and Deborah Ann Kaufman, your nieces, the children of your deceased sister, Carol Kaufman. It is our clients' position that they are entitled to one-half (½) of your father's total estate consisting of joint property, insurance proceeds and those assets which were in your father's trust at the date of his death and which poured over into that trust by the terms of his Will.

Accordingly, I would like to suggest a meeting with you and/or your attorney to discuss this matter before we take whatever action is necessary to protect our clients' interests...."

Upon receiving that letter, appellant consulted attorney Kenneth J. Rothman. On May 20, 1975, Rothman sent a letter to Gabianelli stating:

"Pursuant to our recent telephone conversation, please accept this letter as evidence of the fact that I represent Mr. Michael Bormaster concerning various items of the Estate of his deceased father.

I will take an opportunity to discuss the letter received from you of May 13, 1975, and after I have more facts at my disposal, I will get in touch with you."

On July 8, 1975, Rothman sent another letter to Gabianelli stating, in pertinent part:

"My client brought in a huge stack of papers concerning the estate. I am in the process of looking through these papers and must go to the St. Louis County Courthouse to view the file there. Hopefully, I will complete this shortly and will contact you immediately."

The next day (July 9), appellant paid attorneys Rothman and Fred Roth $500 to represent him in regard to "the pending litigation by the Kaufmans." Appellant's deposition:

"Q. Was it clear at that time, in July of 1975, based on the conversation that you had with Lipmans and Vittert and Kaufman and the correspondence that has been exchanged and your trip down to see Roth and Rothman, that the Kaufmans are getting ready to file a lawsuit against you based upon the fact that this amendment to the trust agreement is not acknowledged?

A. Yes.

Q. Is it also clear at that point that the Kaufmans' theory is that the amendment to the trust is invalid and that the original trust is in effect and that the Kaufman ... daughters are entitled to

whatever they were entitled to under the original trust agreement?

A. I believe so."

On September 12, 1975, Gabianelli sent a letter to Rothman stating, in pertinent part:

"At our recent meeting on September 5 we discussed the theory of the claim against your client, the general extent of the demand, certain statements made by your client and various other matters. . . .

As requested at our meeting, I would like you to supply me with the original Amendment to Mr. Bormaster's Trust, which Amendment was purportedly signed on July 19, 1969. . . . Certainly your client, as Trustee, must have the original in his possession. Since our clients were beneficiaries of the Trust purportedly executed on January 2, 1969, they are entitled to see the original of the purported Amendment. As you know, the only copy of the purported Amendment filed with the Probate Court was an unsigned copy. . . ."

On November 4, 1975, Lynda Beth Kaufman and Deborah Ann Kaufman, by their guardian, Alan Kaufman, filed suit against appellant in the Circuit Court of St. Louis County. The petition, so far as pertinent here, averred that Lynda and Deborah Kaufman were beneficiaries of half the trust created by the trust agreement of January 2, 1969, inasmuch as the copy of the purported amendment of July 19, 1969, filed in the Probate Court, was neither signed by Ben Bormaster or appellant, nor acknowledged. Those defects, pleaded the petition, rendered the amendment "null and void," as the trust agreement (as we noted earlier in this opinion) provided that Ben Bormaster could amend it by a written instrument signed, acknowledged and delivered to the co-trustees. That being so, said the petition, the trust agreement remained as originally executed by Ben Bormaster, unchanged and unaffected by the purported amendment. The petition prayed, among other things, that the court declare the trust agreement "still in force and effect" as initially drawn.

Asked in his deposition how much he stood to lose if the Kaufman daughters won the suit, appellant replied, "If we lost the case, I figured I could have lost 125 to 150,000."

On October 20, 1980, 4 years, 11 months and 16 days after he was sued by the Kaufman daughters, appellant filed the instant suit against respondent, alleging that respondent "negligently failed to acknowledge" the amendment signed by Ben Bormaster July 19, 1969, and that as a direct and proximate result thereof appellant "has been damaged in a sum not yet completely ascertainable by him" (the Kaufman daughters' suit was still pending when appellant sued respondent). Appellant's petition added that he had "expended great sums for attorney's fees in defense of [the Kaufman daughters'] suit and is exposed to great monetary loss, depending on the outcome of [the Kaufman daughters'] action pending against him."

On December 22, 1982, while the instant case was pending between appellant and respondent, the suit between the Kaufman daughters and appellant was settled by appellant agreeing to pay the Kaufman daughters $75,000, part in cash and the remainder by July 1, 1983. The Kaufman daughters released appellant, individually and as trustee, from all claims and demands under the Ben Bormaster trust agreement. The release provided it was not to be treated as a release of respondent or his insuror from any claims pleaded or cognizable in the instant case.

On March 3, 1986, respondent moved for summary judgment in the instant case, insisting that appellant's cause of action against him—if any—accrued "at the latest, during the week of May 13-20, 1975, and that the statute [of limitations] ran on May 19, 1980." May 13, 1975, it will be recalled, was the date of the letter from attorney Gabianelli to appellant, and May 20, 1975, was the date of attorney Rothman's letter to Gabianelli in response. As authority for his contention, respondent cit-

ed *Dixon v. Shafton,* 649 S.W.2d 435 (Mo. banc 1983), which we shall study *infra.*

At the hearing on respondent's motion, the trial court opined that appellant's cause of action against respondent accrued no later than September 12, 1975, the date of Gabianelli's letter to Rothman demanding to see the signed amendment of July 19, 1969. Formal judgment was entered in favor of respondent May 7, 1986.

Section 516.100, RSMo 1978, provides, in pertinent part:

"Civil actions ... can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained."

Appellant did not, in the trial court, dispute respondent's assertion that the applicable period of limitation was 5 years,[2] nor does appellant do so here. Our inquiry, therefore, is whether the record before us establishes by unassailable proof that appellant's cause of action, if any, against respondent accrued more than 5 years prior to October 20, 1980.

On that issue, we look for guidance to *Dixon,* 649 S.W.2d 435. There, a contract was signed August 3, 1971, between two partnerships, referred to henceforth as "Carlton" and "Granada," respectively. Kenneth Bigus, a lawyer, was a member of the latter partnership, and acted as its attorney in the transaction. A clause in the contract was adverse to the Granada partners, but Bigus, without reading the contract, advised his clients to sign it, which they did. Bigus first learned of the malefic clause January 19, 1973. He immediately disclosed its existence to the other Granada partners, recommending that they retain other counsel. They did so on February 14, 1973.

The Granada partners, including Bigus, entered into negotiations with the Carlton partners, taking the position that the pernicious clause had been inserted into the contract through mistake or fraud, and was thus not binding on the Granada partners. The Carlton partners sued the Granada partners in New York in October, 1975, for alleged breach of the contract. On October 25, 1977, the Carlton partners sued the Granada partners in Missouri, asserting the same cause of action. The Granada partners (except Bigus) filed a cross-claim against Bigus May 1, 1978, averring he had committed legal malpractice. The Granada partners ultimately settled with the Carlton partners, paying them $135,000. The settlement left the Granada partners who had cross-claimed against Bigus free to pursue that claim. Bigus then moved for summary judgment, which was granted, the trial court ruling that the 5–year statute of limitations began running on the malpractice claim against Bigus when the contract was signed August 3, 1971, or in any event no later than January 19, 1973, the date that performance of the harmful clause was due by the Granada partners. The Granada partners argued that the statute did not begin running until the New York suit was filed.

On appeal, the Granada partners maintained that position, relying on § 516.100, quoted earlier in pertinent part. They insisted they sustained no damage until the

---

2. Section 516.120, RSMo 1978, provides, in pertinent part:

"Within five years:
....
(4) An action for ... any other injury to the ... rights of another, not arising on contract and not herein otherwise enumerated...."

Cases stating that § 516.120 is the statute of limitations applicable to malpractice actions against attorneys include *Dixon,* 649 S.W.2d at 440; *Jepson v. Stubbs,* 555 S.W.2d 307, 314 (Mo. banc 1977); *Miller v. Larson,* 712 S.W.2d 56 (Mo.App.1986); *Lewis v. Barnes Hospital,* 685 S.W.2d 591, 593 (Mo.App.1985); *Fischer v. Browne,* 586 S.W.2d 733, 736 (Mo.App.1979).

litigation began, and that their damages were not "capable of ascertainment" until the Missouri suit was filed. Furthermore, they said, one item of damages could not have been ascertained any earlier than a date within 5 years of the date of the cross-claim, May 1, 1978.

The Supreme Court noted that the phrase in § 516.100 referring to the damage being "capable of ascertainment" had always been read as referring to the *fact* of damage, rather than to the *precise amount. Id.* at 438. The opinion explained: "The most that is required is that some damages have been sustained, so that the claimants know that they have a claim for some amount." *Id.* at 439.

Applying that rationale, the Court held that the statute of limitations began running on the malpractice claim against Bigus no later than February 14, 1973, the date that the Granada partners retained independent counsel after being notified by Bigus of his mistake.[3] On that date, said the Court, the Granada partners knew that a substantial claim existed against them and that they had suffered some damage, at least to the extent that they had to hire new counsel who would have otherwise been unnecessary. They also realized they could avoid liability to the Carlton partners, if at all, only with expenditure of even more substantial amounts for attorney's fees. *Id.* at 438. Summary judgment in favor of Bigus was upheld.

In applying *Dixon* to the instant case, we begin by observing that the theory of appellant's claim against respondent—as spelled out in appellant's petition—is that respondent committed malpractice on July 19, 1969, by negligently failing to acknowledge the amendment signed in respondent's presence that date by Ben Bormaster.[4] If we determine that the statute of

limitations had run on that claim prior to October 20, 1980, we need not decide whether respondent's alleged dereliction constitutes malpractice.

Given the theory of appellant's claim, the question under § 516.100 becomes—to borrow a jaded phrase of yesteryear—what did appellant know and when did he know it.

It is undisputed that prior to May 13, 1975 (the date of Gabianelli's first letter), appellant knew that (a) respondent had prepared the amendment of July 19, 1969, (b) an unsigned and unacknowledged copy of such amendment had been filed in the Probate Court, (c) no acknowledged copy of the amendment had been located, (d) Alan Kaufman and his daughters were insisting that the absence of an acknowledgement on the amendment rendered it invalid, leaving the trust in effect as originally established, (e) if he rejected Alan Kaufman's demand for money, he (appellant) might be sued, and (f) if the Kaufman's theory about the invalidity of the unacknowledged amendment were correct, the trust would stand as originally constituted.

Upon receiving Gabianelli's letter of May 13, 1975, appellant knew the Kaufmans had retained a lawyer, and that they were claiming a half interest in the trust. That letter informed appellant that Gabianelli intended to "take whatever action is necessary" to protect his clients' interests.

By May 20, 1975, appellant had consulted attorney Rothman in regard to Gabianelli's letter.

By July 8, 1975, appellant had brought Rothman "a huge stack of papers" concerning Ben Bormaster's estate. The next day (July 9), appellant made his first financial outlay, paying attorneys Rothman and Roth $500 to represent him regarding "the

---

3. By reason of that holding, the Supreme Court in *Dixon* found it unnecessary to decide whether the statute of limitations had commenced running at the time Bigus told his clients to sign the contract. *Id.* at 438.

4. In a first amended petition filed June 4, 1984, appellant predicated malpractice on respondent's failure "to have the instrument acknowl-

edged or to instruct ... Ben Bormaster to sign the instrument before a Notary Public, but negligently allowed Ben Bormaster to sign same without an acknowledgement thereon." We perceive no material difference between that allegation and the one in appellant's original petition.

pending litigation by the Kaufmans." Appellant, in his deposition, conceded that by that time, it was clear that the Kaufmans were preparing to sue, and that their theory was that the amendment of July 19, 1969, was invalid, leaving the original trust agreement in effect.

These facts, in our opinion, establish that under § 516.100, as construed in *Dixon*, appellant's claim against respondent (if indeed he had one) accrued no later than appellant's payment of the $500 attorney fee July 9, 1975. At that juncture, appellant knew all the facts that supplied the basis for his claim that respondent had committed malpractice July 19, 1969, and appellant had incurred his first damages, the $500 attorney fee. True, appellant did not know what his full damages would ultimately be—he did not learn that until he settled with the Kaufman daughters and finished paying his lawyers—but that uncertainty, under *Dixon*, did not prevent the statute of limitations from starting to run when appellant's first damages were incurred.

Appellant, endeavoring to evade *Dixon*, tenders five arguments. The first two state that there are unresolved issues. Those issues, to quote appellant's brief, are:

"(A) Whether, in fact, respondent represented the appellant and that an action could be maintained against him when the respondent was hired to draw the documents by Ben Bormaster, the appellant's father; and

(B) Whether the amended trust agreement prepared by the respondent was defective was yet to be determined and adjudicated, and appellant does not know if respondent is guilty of negligence."

Appellant's hypothesis, as we understand it, is that because he could not, on July 9, 1975, conclude with absolute certainty that he had a legally cognizable claim against respondent, the statute of limitations did not commence running that date. If that argument be sound, the statute has not yet, even at this late date, begun to run, as it has not yet been determined by a court

of competent jurisdiction whether respondent owed any duty to appellant in the preparation and execution of the amendment of July 19, 1969, it has not yet been determined by any court whether respondent committed malpractice in permitting Ben Bormaster to leave the restaurant with the unacknowledged amendment on July 19, 1969, and it has not yet been determined by any court whether such amendment was void by reason of being unacknowledged.

The paucity of merit in such a theory is demonstrated by *Dixon*. There, it was never determined whether Bigus' clients had a valid malpractice claim against him, nor was it ever determined whether the troublous clause was valid. Those unknowns did not forestall the running of the statute of limitations.

Appellant attempts to distinguish the instant case from *Dixon* by arguing that here, respondent "never admitted to committing an act of malpractice and constantly maintained he had no obligation to notarize a document he drew." If the statute of limitations on a malpractice claim against a lawyer does not begin running until he admits he committed malpractice, a lawyer accused thereof has the Hobson's choice of admitting he is guilty of malpractice, thereby starting the statute running, or refusing to so admit, thereby tolling the statute and remaining everlastingly exposed to suit.

That is not the teaching of *Dixon*. There, although the lawyer told his clients what had happened, nothing in the opinion implies that the lawyer confessed that his carelessness constituted malpractice. The lesson of *Dixon* is that the statute of limitations on a malpractice claim against a lawyer begins running when the clients become aware of the facts constituting the alleged malpractice, realize they are facing a claim by reason thereof, and sustain damage. All of those elements occurred in the instant case by July 9, 1975. The fact that respondent never conceded he was guilty of malpractice did not prevent the statute of limitations from starting to run that

date. Appellant's first two arguments are meritless.

Appellant's third argument is, in the words of his brief:

"(C) The statute of limitations had not expired because appellant could not ascertain that he was damaged until he actually paid a portion of his inheritance to his nieces on December 22, 1982."

That contention is squarely refuted by *Dixon*. There, the Granada partners did not settle the claim against them by the Carlton partners until after the Granada partners had cross-claimed against Bigus. The Granada partners had, however, incurred attorney fees years earlier as a result of Bigus' alleged malpractice. Identical circumstances exist in the instant case. If the statute of limitations was not already running on appellant's claim against respondent by July 9, 1975, appellant's damage on that date (the $500 fee to attorneys Rothman and Roth) undoubtedly triggered it.

Appellant's fourth argument, as phrased in his brief, is:

"(D) Alternatively, the statute of limitations had not expired because appellant could not ascertain that he was damaged until he was sued on November 4, 1975."

What we said in regard to appellant's third argument applies with equal force to his fourth argument. The fourth argument is denied.

Appellant's final argument is:

"(E) Alternatively, the statute of limitations had not expired because appellant could not ascertain he was damaged prior to being sued as all notices prior to November, 1975, dealt only with assertions that the document was defective as a case of first impression in Missouri."

Expanding that argument, appellant insists he did not know whether the Kaufman daughters were correct in their position that the unacknowledged amendment of July 19, 1969, was invalid, as that question had never been decided by a Missouri court. Appellant asserts he could not pursue the case against respondent "until the

[amendment of July 19, 1969] was declared unenforceable and/or he sustained damage as a result thereof." Prior to his settlement with the Kaufman daughters on December 22, 1982, appellant, so he says, had to maintain that the amendment was valid and enforceable. Appellant avers it was only after the settlement that he "knew his damages."

Appellant's position was no different than that of the Granada partners in *Dixon*. They were insisting they owed nothing to the Carlton partners at the time they cross-claimed against Bigus, and they did not learn the extent of their damages until they ultimately settled with the Carlton partners. The instant case is indistinguishable from *Dixon*.

We recognize that appellant (had he filed this suit within the statute of limitations) would have been unable to prove how much he was damaged by respondent's alleged malpractice until the suit against appellant by the Kaufman daughters was either settled or reduced to judgment. That, however, was also true in *Dixon*.

In sum, *Dixon* answers, adversely to appellant, all of his contentions, and, as *Dixon* is the last controlling decision of the Supreme Court of Missouri, we are bound to follow it. Mo. Const. art. V, § 2 (1945); *Estate of Seabaugh*, 654 S.W.2d 948, 957[4] (Mo.App.1983).

Judgment affirmed.

GREENE, P.J., and PREWITT, J., concur.

TITUS, J., not participating.