**Ralph WILSON and Carolyn Wilson, Appellants,**

v.

**David D. LODWICK, Respondent.**

**No. WD 60970.**

Missouri Court of Appeals, Western District.

Dec. 24, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 28, 2003.

Application for Transfer Denied March 4, 2003.

Daniel John Strausbaugh, Overland Park, KS, for Appellant.

Rodney James Hoffman, Kansas City, for Respondent.

PAUL M. SPINDEN, Presiding Judge.

This is a malpractice lawsuit against David Lodwick in which Ralph and Carolyn Wilson accuse him of breach of contract and negligence for not filing a financing statement to perfect the Wilsons' security interest. The circuit court granted summary judgment for Lodwick on the ground that the Wilsons' claim was barred by the statute of limitations. Because the circuit court erred in granting summary judgment to Lodwick on the basis of a motion that did not state a *prima facie* case for his affirmative defense of limitations, we reverse the summary judgment and remand for further proceedings.

In seeking summary judgment, Lodwick's motion pleaded:

1. [Ralph and Carolyn Wilson] are the owners of a Missouri corporation known as R & C Auto Parts, Inc., which in 1990, owned and operated three auto parts stores[.]

2. R & C Auto Parts owned the furnishings, fixtures, shop equipment and inventory in the parts stores....

3. In 1990, the inventory and other assets of R & C Auto Parts were sold to McClain Auto Parts, Inc....

4. The sale was to be financed in part by a promissory note from McClain

Auto Parts secured by a first lien in inventory and other assets[.]

5. The terms of the sale of assets included a $100,000 down payment at closing with R & C financing for the balance.... R & C Auto Parts required a first lien on the collateral for the loan[.]

6. At the same time, McClain Auto Parts borrowed the down payment from Auto Parts Finance Company ("AFCO") and arranged for ongoing inventory financing with APS, Inc. Both arrangements were secured by interests in McClain Auto Parts inventory and other assets[.]

7. APS, the inventory supplier, and its finance arm, AFCO, required a lien on the same collateral, including the auto parts inventory which also was used as collateral for the lien to R & C Auto Parts[.]

8. Mr. Wilson, on behalf of R & C Auto Parts, was adamant that the Seller would have a first lien:

A. There was no way that I was going to take a second. I had to be first or the sale would not go through. [Excerpt from Ralph Wilson's deposition.]

Q. Throughout this sales process, from the time of Ralph's first contact to you, and I think you said in June, until the final closing of this, did Ralph's position as far as his desire to be in the No. 1 position ever change?

A. No. Ralph was adamant about being first secured, or he wasn't going to sell them to Gene McClain. He had to be first secured. [Excerpt from William Licklider's deposition.]

9. [Ralph and Carolyn Wilson], McClains, APS and AFCO, agreed that to accomplish the result of R & C Auto Parts having a first priority lien, APS and AFCO would delay filing their UCC–1 financing statements until UCC–1 financing statements were filed for R & C Auto Parts. ...

10. The security interests of APS and AFCO were to be subordinate to the security interest of R & C Auto Parts[.] ...

11. Defendant David Lodwick drafted documents with regard to the asset sale, including Promissory Note, Purchase Agreement, Security Agreement, Bill of Sale, and UCC–1 Financing Statement[.] ...

12. The documents were executed, at closing of the sale in Mr. Lodwick's office on July 30, 1990[.]

13. Defendant Lodwick did not file the UCC–1 financing statements in 1990[.]

14. AFCO loaned McClain Auto Parts $100,000 in August 1990[.]

15. In September, 1990, APS and AFCO filed their financing statements[.]

16. The financing statement filed on behalf of APS in September 1990 related to the $100,000 loan by APS to McClain Auto Parts[.]

17. [Ralph and Carolyn Wilson] learned in 1991 that financing statements for R & C Auto Parts had not been filed in 1990[.]

18. UCC–1 Financing Statements were ultimately prepared and recorded in 1991 by [Ralph and Carolyn Wilson's] personal attorney, Larry Schulz, to perfect R & C Auto Parts' security interest in the collateral....

19. The Wilsons' personal attorney Larry Schulz prepared and filed the UCC financing statements on behalf of R & C Auto Parts in 1991 after conducting a search of public filing records.

The search showed lien filings by the auto parts companies. . . .

20. In 1991, [Ralph and Carolyn Wilson] understood that if the R & C Auto Parts' financing statements had not been filed in 1990 before APS and AFCO financing statements, the R & C Auto Parts lien may not be first in priority.

Q. What was your understanding of the significance of the fact that these UCC–1's hadn't been filed in 1991 on behalf of R & C?

A. Well, I found out later that if they weren't filed first, then you weren't first secured.

Q. And what was your understanding then of the significance you were now in a third place or presumed—could have been a third place as opposed to a first place?

A. I don't—I'm not sure I knew I was third then because it was my understanding that he didn't find the filing on APS, but maybe he did. I don't know. That's been so long ago, I really can't remember. But I do know that third was not a very good position for me to be in.

Q. Not what you had bargained for, in any event?

A. And not what I bargained for, right.

[Excerpt from Ralph Wilson's deposition.] . . .

21. The Wilsons' attorney submitted bills for the UCC search and preparing the financing statements that were filed in 1991. . . .

22. The attorney fee bills for the 1991 UCC search and preparation by attorney Larry Schulz were paid[.] . . .

23. Neither Mr. and Mrs. Wilson nor their attorney, Larry Schulz, contacted Attorney Lodwick or William Licklider

in 1991 after the Wilsons learned that the financing statements had not been filed. . . .

■■■ As a defending party, Lodwick is entitled to summary judgment if he is able to establish "that there is no genuine dispute as to the existence of each of the facts necessary to support [his] properly-pleaded affirmative defense." *ITT Commercial Finance Corporation v. Mid–America Marine Supply Corporation,* 854 S.W.2d 371, 381 (Mo. banc 1993). The first step in determining whether summary judgment should be granted is to focus on Lodwick's pleadings. "When, and only when, the movant has made the prima facie showing required by Rule 74.04(c), Rule 74.04(e) places burdens on the non-movant." *Id.*

■■■ Hence, the first step in our review is to consider whether the facts pleaded in Lodwick's motion established a *prima facie* case for establishing that the statute of limitations had expired and that the Wilsons' claim was barred. Because the propriety of granting summary judgment is an issue of law, our review is *de novo* without deference to the circuit court. *Id.* at 376.

■■■ As set out in § 516.120,[1] legal malpractice actions are subject to a five-year statute of limitations. *Delp v. Doe,* 895 S.W.2d 91, 92 (Mo.App.1995). The limitations period begins running when the cause of action accrues. *Jepson v. Stubbs,* 555 S.W.2d 307, 311 (Mo. banc 1977). Section 516.100 governs when a cause of action accrues, and it says:

> [F]or the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is

---

1. Citations to statutes refer to the 2000 Revised Statutes.

capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Damage is sustained and capable of ascertainment when a plaintiff could discover the damage despite his remaining ignorant of the extent of damage. *Jordan v. Willens,* 937 S.W.2d 291, 294 (Mo.App.1996); *M & D Enterprises, Inc. v. Wolff,* 923 S.W.2d 389, 394 (Mo.App.1996). The extent of potential damages need not even be knowable. *Klemme v. Best,* 941 S.W.2d 493, 497 (Mo. banc 1997). All that is required is that *some* damage be sustained. The Supreme Court has said:

> In many actions the extent of damage may be dependent on uncertain future events.... Such uncertainties have never been held to preclude the filing of suit and ... have not delayed the accrual of the plaintiff's claim for purposes of the statute of limitations. The most that it required is that some damages have been sustained, so that the claimants know that they have a claim for some amount.

*Dixon v. Shafton,* 649 S.W.2d 435, 439 (Mo. banc 1983).

Although the suit was not commenced until January 2000, Lodwick's motion contended that it was undisputed that the Wilsons suffered damage in 1991 when they ascertained that he had not filed their financing statement because they lost the opportunity to foreclose without the concern of facing a superior lien on the same collateral. The motion also averred that it was undisputed that the Wilsons were damaged by having to pay a second attorney to record the financing statement in perfection of their security interest. While this was possibly the case, the facts averred by Lodwick were insufficient for us to conclude that it was, without dispute, the case.

Lodwick averred that APS and APFC had agreed to subordinate their security interests to the Wilsons' security interest. APS and APFC's agreeing to subordinate their security interests to the Wilsons' interest may—we cannot be entirely certain from these facts—have put the Wilsons in as good a position as they would have been in had the financing statement been filed. Potentially, we cannot be certain the agreement protected the Wilsons from APS' asserting priority, and the Wilsons would not have lost in 1991 the opportunity to foreclose without the concern of a superior lien. This would mean that the note and security interest would not have lost value because of the collateral's being subject to superior liens. Rather, the effect would have been to recognize priority in the Wilsons notwithstanding APS' actually filing first. Section 400.1–102(3).[2]

Lodwick also contends that the Wilsons suffered damages in 1991 by expending funds to hire a second attorney to file the financing statement for them. Lodwick's motion, however, does not state a *prima facie* case that the second attorney's funds constituted damages attributable to Lodwick's breach of contract or negligence.

That the expenditure of attorney fees can constitute an accrual of damages is

---

**2.** As provided in § 400.9–316, parties "entitled to priority" can also alter their priority through a subordination agreement. When APS, APFC, and the Wilsons made their agreement, whatever its terms may have been, none of them was a "person entitled to priority." The record says that they reached an agreement that the Wilsons would be first secured before their respective security interests were even created, let alone given priority. Thus, we will not address what impact a subordination agreement under § 400.9–316 would have had on the transaction.

not a new concept. In *Dixon v. Shafton,* 649 S.W.2d 435 (Mo. banc 1983), two partnerships, Carlton Green Associates and Granada Associates, executed a contract containing a clause that was financially adverse to Granada. One of the Granada partners, Kenneth Bigus, was also the partnership's attorney, and he signed the contract and advised the remaining partners to sign it even though he had not read the final version and was unaware of the clause's inclusion. Carlton Green Associates eventually asserted a claim for additional money in accordance with the clause. Bigus disclosed the clause's existence to his partners and recommended that they obtain new counsel. Granada was ultimately sued for a substantial sum of money and cross-claimed against Bigus, who asserted the statute of limitations. The court held that the cause of action accrued on the day that Granada obtained new counsel. On that day, Granada "knew that a substantial claim existed as to them"; hence, they suffered the damage of having to hire a new attorney and expend a substantial amount of money for attorney fees. *Id.* at 438.

■ While we agree that attorney fees can constitute accrued damages, the expenditure of those fees is not of itself conclusive. "The lesson of *Dixon* is that the statute of limitations on a malpractice claim against a lawyer begins running when the clients become aware of the facts constituting the alleged malpractice, realize they are facing a claim by reason thereof, and sustain damage." *Bormaster v. Baldridge,* 723 S.W.2d 533, 540 (Mo.App. 1987). In other words, the client's expenditure of money for attorney fees alone does not necessarily trigger accrual of a cause of action; it is the expending of money for attorney fees in realization that the client is subjected to harm or exposed to a claim that triggers accrual of a cause of action. *See e.g., Bormaster,* 723 S.W.2d

at 539–40 (malpractice action accrued when client expended $500 in attorney fees after learning that another party was claiming an interest in his trust as a result of attorney's failings); *M & D Enterprises, Inc.,* 923 S.W.2d at 395–97 (malpractice action accrued when client had to pay significant sums in court costs or hired a new attorney who required a higher contingency fee after attorney failed to properly pursue claims and subjected client to substantial financial losses); *Chicago Title Insurance Company v. Jackson, Brouillette, Pohl and Kirley, P.C.,* 930 S.W.2d 22, 24–25 (Mo.App.1996) (malpractice action accrued when claimant's assignor expended attorney fees after attorney made misrepresentation that resulted in claimant's making an ill advised loan at substantial financial loss).

Assuming, as Lodwick contends, that the Wilsons had an agreement with APFC and APS that they would subordinate their priority rights, the Wilsons' expenditure of attorney fees would not have resulted from their being subjected to harm or exposed to a claim. Arguably, looking only at the averments of Lodwick's motion, the Wilsons' interests were protected by their agreement. The Wilsons, therefore, would not have faced any loss or claim when their new attorney filed a financing statement in 1991. As between APS and the Wilsons, the Wilsons would effectively have had priority even though they had not filed first. Section 400.1–102(3). As to future secured creditors, they would have had priority by virtue of their filing before them. *Sur–Gro Plant Food Company, Inc. v. State Savings Bank,* 730 S.W.2d 602, 604 (Mo.App.1987); § 400.9–312(5)(a).

Even if the Wilsons had suffered in 1991 all the damages alleged by Lodwick and even if the damages were of a nature sufficient to trigger the running of the statute of limitations, Lodwick did not establish that summary judgment was appro-

priate. From the facts averred by Lodwick, we do not know whether it was his, or some one else's, responsibility to file the financing statement. If it was not Lodwick's responsibility, then the damages that Lodwick asserts did not result from Lodwick's breach or from Lodwick's failing. Those damages would be of no consequence in determining when the statute of limitations began to run.

Because the averments in Lodwick's motion failed to articulate a *prima facie* case for the running of the statute of limitations, the circuit court erroneously granted summary judgment for Lodwick. We, therefore, reverse the circuit court's summary judgment and remand the case to the circuit court for further proceedings.

PATRICIA A. BRECKENRIDGE, Judge, and THOMAS H. NEWTON, Judge, concur.